# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES | : | 3:20 CR 126 (JBA) |
| | : | |
| | : | |
| V. | : | |
| | : | |
| | : | |
| ASANTE GAINES | : | MAY 26, 2022 |

## SENTENCING MEMORANDUM

      Asante Gaines respectfully files this sentencing memorandum to assist the Court in arriving at a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing contained in 18 U.S.C. § 3553(a), with particular emphasis on his background and the extent of his participation in the overall conspiracy. For the various reasons discussed below, Asante respectfully asks the Court to impose a sentence of 150 months.

## I.    Asante Gaines' Personal Background and Character

      Like so many others who appear before this Court, Asante was born and raised by his single mother, Sheila Hagwood, under very trying circumstances. When Asante was a toddler, his mother and father divorced. Asante's father was addicted to drugs and has been in and out of jail for much of the past two decades. After the divorce, Ms. Hagwood and Asante moved from Bridgeport to West Haven to distance themselves from Asante's father. Asante had virtually no contact with his father during his formative years.

      Ms. Hagwood remarried and life was stable for three or four years. She worked difficult and low paying jobs, primarily as a CNA. "Life was good" when Asante lived with his mother and stepfather, according to Asante. His mother agrees, and she was well aware of the importance of exposing Asante to positive influences at a young age. She enrolled him in boy scouts, music lessons, sports activities, summer camps with religiously and culturally diverse

children, and she taught him not to judge people by their skin color. She also brought him to museums and libraries. (PSR ¶ 129).

But Ms. Hagwood's divorce from Asante's stepfather changed everything. Asante felt "abandoned and traumatized" by the divorce according to his mother. (Id.) Despite Ms. Hagwood continuing to work, the loss of a second income resulted in their eviction from their West Haven apartment. After living temporarily with Asante's maternal grandmother in West Haven and then friends in West Haven, Hamden and Milford, they moved to a homeless shelter in Ansonia when Asante was nine or ten years old. Ms. Hagwood was ultimately able to obtain an apartment in Bridgeport. It seemed like a fresh start at the time, but her view has changed considerably with the benefit of hindsight.

Kids in the Bridgeport school that Asante attended behaved differently than in his previous schools. He was as an intelligent and inquisitive boy, but his new classmates ridiculed and bullied him for being a nerd. Like many children at that age, Asante wanted to be included, and the pressure to conform was even greater because he was the "new kid." He succumbed to peer pressure like many children do and his behavior changed for the worse. Daee Muhammad McKnight, the Transitions Mentoring Reentry Coordinator at Family Reentry in Bridgeport, has known Asante since Asante was about eleven years old. Mr. McKnight "watched [Asante] go from a very respectful intelligent young man to hiding his intelligence to seek approval from other people in order to fit in." **(Exhibit A at 7)**.

Asante's association with the wrong crowd and ultimate decision to join GHB are not surprising given the absence of a positive male role model during his formative years, a point

2

that is repeated in the character letters submitted on his behalf.[1] **(See Exhibit A at 2, 3-4, 12)**. Asante is now at his nadir. But there is reason to be optimistic.

The first step in making a positive change is to recognize one's wrongdoing and the poor judgment that preceded it. Asante has expressed these sentiments numerous times during our meetings. He takes full responsibility for his actions and is very remorseful for the mayhem that he caused. I am confident that he has a significantly better understanding of the importance of making good decisions going forward. He knows that similar behavior in the future will not be tolerated and will result in an even longer period of incarceration than he currently faces.

The content of Asante's thoughts and words is obviously important, but so too is an aspect of his personality that is not apparent to anyone who has not met him in person. Asante and I have spent many hours together over the past year. He has consistently been polite, respectful and soft spoken. His thoughts and questions have been appropriate in content and tone. After a number of meetings over many hours, it occurred to me that he had never once cursed. That is fairly unusual in my experience. I realize that Asante may speak and act differently

---

[1] "The absence of fathers and the prevalence of single-female-headed families gravely impairs the ability of children, particularly boys, to internalize positive values as they mature. Young men who lack . . . [an] effective father figure, both as a role model and as a viable presence in their lives, are often hard-pressed to organize their lives in accordance with his standards, standards handed down from generation to generation[.]" United States v. Bannister, 786 F. Supp.2d 617, 639 (E.D.N.Y. 2011) (citation and internal quotations omitted).

"For many boys, the cumulative result of poverty, racial segregation, antisocial ethics, and fatherlessness is often crime. "Their career 'choices' and their major life changes largely result from, and are coextensive with, their background and the disturbed family systems in which they were raised and/or currently reside. Persons who grew up in severely distressed households learned strategies that leave them ill-equipped for conventional society." Bruce D. Johnson, et al., *Crack Distribution and Abuse in New York,* 11 Crime Prevention Stud. 19, 26 (2000). *Accord* Glenn C. Loury, *Crime, Inequality & Social Justice,* Daedalus, Summer 2010, at 136–37 ("The factors that lead young people to crime—the 'root causes'—have long been known: disorganized childhoods, inadequate educations, child abuse, limited employability, delinquent peers. These are factors that also have long been more prevalent among the poor than the middle classes[.]")

around his friends, but my own observations reinforce what his mother and others have said about him being raised to be respectful and act appropriately. There is no question that Asante knows what to do; now he needs to develop the strength of character to do it even if it prompts a negative reaction from his peers.

My observations are consistent with those of the people who know Asante best. Nasiyra Clayton has known him since he was born. She describes him as "very respectful," "caring" and "intelligent." (**Exhibit A at 2**). As a boy, Asante loved going to church and prayed regularly with his aunt, Pamela Hagwood. (**Id., 9**). Asante's cousin, Cassandra Gaines, has written a very informative letter. From age five to ten, Asante would spend some nights and weekends at her house where he would socialize with her two older sons who were two years and five years younger than Asante. Asante acted like a big brother to them, according to Ms. Gaines. She notes that he longed for the paternal and sibling relationships that he was missing. Ms. Gaines moved from Connecticut to Charlotte, North Carolina because "my environment was no longer suitable to raise my 3 sons," who are now 23, 20 and 14. The older boys are in the United States Army and college, and the youngest is on the honor roll. She attributes their success to the relocation to Charlotte. Ms. Gaines notes that her sons "have done well . . . but I know that is because I uprooted them from [a] dysfunctional family/environment." Asante did not have the same opportunity. He "yearns for guidance/counseling and more important to be fathered," in Ms. Gaines' view. (**Id., 3-4**).

Two of Asante's peers also provide helpful insight into his character. Khaliq Brown used to run in the same circles as Asante, getting in trouble himself, but he has proven that rehabilitation is possible. Mr. Brown is a licensed realtor in his late twenties who is building his

career after serving seven years in prison beginning at age 17.[2] Mr. Brown and Asante met as teenagers while playing sports in Bridgeport. Mr. Brown went to prison in 2012 and they met again in the Second Chance Unit at the Willard-Cybulski Correctional Institution in 2018. Mr. Brown noted Asante's interest in history, real estate and the stock market, and describes Asante as "a very bright young man who can make a change in his life with the right influence and exposure." Mr. Brown and Asante have remained in touch during Asante's present incarceration and they have "continued to build on topics that breed success and a positive change." (**Id., 5-6**). Mr. Brown is important in two respects. First, he demonstrates that many young people who serve long prison sentences can reform and lead productive lives. As he notes in his letter, "[a]s humans, we make mistakes, when we learn to correct them, change then occurs." (**Id.**) Second, he appears to be a positive influence on Asante and the embodiment of what Asante can accomplish when he is released. Mr. Brown will hopefully continue to succeed and shares his knowledge and experiences with Asante. Ayana Sewell has been friends with Asante since they were in sixth grade. She describes him as "outgoing," "funny," "nice," "caring" and "really sweet." (PSR, second addendum, Doc. 551).

Asante has proven that he has the capacity for self-improvement. Although he did not complete high school, he obtained his GED while incarcerated. He has also been employed, including his most recent employment on a construction site in 2019. **(See Exhibit B)**. Asante has also taken steps to better himself while detained at Wyatt where he has completed the following programs:

*S.M.A.R.T Goals Techniques*;

*S.M.A.R.T Goals Techniques, Part Two*;

---

[2] https://www.linkedin.com/in/khaliq-r-brown-8614b9230. (Last checked May 23, 2022).

*Anger Management Workbook*;

*Mental Health Awareness*;

*Rational Thinking*;

*Adjustment to Incarceration*;

*Criminal Lifestyles*;

*Substance Abuse Workbook*;

*Taking a Chance on Change*;

*Substance Abuse*; and

*Mental Health Alternative Thought & Thinking Process*.

**(Exhibit C)**. And in nearly two years there, he has received only one ticket, for a nonviolent relatively minor infraction. (PSR ¶ 6). Consistent with how others have describe him, staff members at Wyatt state that Asante is "respectful towards staff and peers." **(Exhibit D)**. As he continues to work on his rehabilitation, he has the support of his family and others, including Mr. McKnight, who, having known Asante for well over a decade, sees a young man with "endless potential," "intelligence," and "invaluable redeemable qualities." **(Exhibit A at 7)**.

Asante's goals include to get married and have children. Perhaps the only positive that comes from his circumstances is that he has not yet had any children who will grow up without their father. Rather than following the example set by his father, Asante's childhood and his present situation have made him realize the importance of being present and a good role model for his children. When he does become a father, his criminal activity will be in his past, which will allow him to be present and teach his children what he has learned from his own mistakes. This includes that life on the streets is not a long term plan, but virtually always results in death or incarceration. Asante's children will have the opportunity to learn valuable lessons not only

6

from him, but also from their grandmother. Ms. Hagwood has always known that a young person must have a plan for his life and take proactive steps to achieve his goals. Although Asante and his mother have always had a good relationship, it has taken the present prosecution for him to start listening to what his mother has been saying for years. Like many young people, Asante thought he knew everything and had all the answers. This case has opened his eyes, as often occurs when a person is dealing with adversity while simultaneously maturing with age. Through my conversations with him over the past year, it is apparent that Asante recognizes the value of his mother's advice during his adolescence and young adulthood. I am confident based on my interactions with him that he will finally apply those lessons when he has the opportunity to do so.

## II.      **Applicable Law**

Because the sentencing guidelines are no longer mandatory, this Court must consider the guidelines as well as the other factors set forth in 18 U.S.C. § 3553(a) when determining a sentence that is "sufficient, but not greater than necessary" to meet the purposes of federal sentencing. United States v. Booker, 543 U.S. 220, 258 (2005); United States v. Crosby, 397 F.3d 103, 110-14 (2d Cir. 2005).

## III.     **Argument**

Asante's argument for a non-guidelines sentence of 150-months is based primarily on his background and character, which were discussed above, as well as the following considerations discussed in sections III.A to III.C. below. These include: (A) the offense conduct; (B) the overrepresented seriousness of Asante's criminal history; and (C) the need to avoid unwarranted sentencing disparities.

A.      **The Offense Conduct**

Asante unquestionably participated in the courthouse shooting at approximately noon on January 27, 2020. His involvement is a bit surprising given his initial levelheaded response to the incident that precipitated it. Less than 24 hours earlier, at 5:37 p.m. on January 26, Myreke Kenion was shot and killed and Dandre Brown was shot in Bridgeport. Later that night, Asante messaged Kenion's brother, Bert Carter, on Facebook, writing "whenever you ready to talk I'm here fa you. . . ." Asante also tried to dissuade Carter from retaliating when he wrote that Carter should "think everything out before u make that choice to pack you bags" and "think about ya mom before you make that choice." (PSR ¶ 32). The government and Asante agree that "[Asante] was advising Mr. Carter to be careful and to think about any retaliatory acts before he did them." (<u>Id.</u>) In the message, Asante acknowledged that he could not tell Carter what to do, but it is evident that he tried to discourage Carter from retaliating at that point. Multiple communications occurred over the next few hours between several of the codefendants, including Asante. (<u>Id.</u> ¶ 33). The plan for the following day was presumably discussed among them at that time or the next morning. Asante left New Haven at 10:07 a.m. on January 27 according to his GPS monitoring bracelet. The individuals involved in the courthouse shooting were communicating with each other during the morning. (<u>Id.</u> ¶ 36). With respect to Asante's role, it is important to remember that he: (1) did not shoot anyone; (2) was not present in the car from which any shots were fired; (3) did not go inside the courthouse to confirm the victims' presence at court; and (4) did not drive any of the cars involved in the shooting. This does not excuse his participation in what was a joint enterprise, of course, but it does differentiate him from the participants who shot, scouted the inside of the courthouse and drove the cars.

The offense conduct for the RICO conspiracy includes more than the January 27 shooting. With that in mind, it is important to put Asante's participation in context:

• Count one of the superseding indictment charges *four other shootings; Asante is not alleged to have participated in any of them*. (Doc. 92 at 7). Multiple codefendants admitted their involvement in the other shootings, including U.K., who committed three shootings, and J.B. and D.B., who each admitted their involvement in two shootings. (See Docs. 266 at 6; 270 at 4; 314-1 at 4-5).

• Asante does not appear in any of the rap videos that the government has published, let alone as the vocalist. The government has argued that "[w]itnesses have related that the number of gang members who appeared in a video demonstrates the influence the vocalist had in the gang." (Doc. 513 at 5).

• Asante was incarcerated for more than two-and-a-half years of the conspiracy and thus did not actively participate during those periods.[3]

## B.  Criminal History and Its Impact on the Appropriate Sentence

Three aspects of Asante's criminal history are especially important in this case. ***First***, the guidelines recognize that a person's criminal history score can substantially overrepresent the seriousness of his criminal history. U.S.S.G. § 4A1.3(b). "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." Id. Section 4A1.3(b) is usually cited in support of an argument for a reduction in criminal history category. See U.S.S.G. § 1B1.1, application note

---

[3] Asante was in custody from April 13, 2015 to April 24, 2015 when he was released on bond; September 3, 2015 to October 7, 2016; January 31, 2017 to March 2, 2017; and February 16, 2018 to June 17, 2019. (PSR ¶¶ 101, 151). This totals approximately 30.5 months.

1(E). Given the offense level in this case (39 in the plea agreement and 41 according to the

probation officer), a formal reduction in criminal history category of two or three categories

under § 4A1.3(b) will not change the guidelines range. Asante therefore raises this point in

support of his argument for a non-guidelines sentence.

A review of Asante's convictions shows that he has received relatively high sentences,

thereby increasing his criminal history score, for mostly nonviolent and relatively minor

offenses.[4] Six criminal history points stem from one sentencing hearing on March 9, 2018. He

was sentenced that day to three years' incarceration for violation of probation (PSR ¶ 101),

interfering/resisting (Id. ¶ 109), and failure to appear (Id. ¶ 110).[5] On March 28, 2018, seventeen

days after he began to serve the sentence imposed on March 9, Asante was served with a warrant

for not mailing a form with his name and address to the state's deadly weapon registry. He

pleaded guilty two weeks later, on April 13, and received a sentence of two years concurrent to

the sentence he was already serving. (Id. ¶ 111). Although the April 13 sentence did not add any

actual time to the previous sentence, and is an offense for which a two year sentence seems

excessive, it resulted in the maximum of three additional criminal history points. Asante has

therefore accrued nine criminal history points for a violation of probation, interfering, and failure

to appear, for which he was sentenced on the same day, and for the registration violation for

---

[4] As the Court knows, U.S.S.G. § 4A1.1 assigns three points for any sentence exceeding one year
and one month; two points for any sentence at least sixty days; and one point for each sentence
not previously counted, up to a total of four points.

[5] Paragraphs 101 (three points), 109 (two points) and 110 (three points) total eight criminal
history points, but a more accurate description of the March 9, 2018 sentence is that it resulted in
six points because the three-point violation of probation in paragraph 101 had already received
two points for the one year sentence from the underlying conviction. See U.S.S.G. § 4A1.1(b).
Thus, the violation of probation itself resulted in an additional point.

which he was sentenced barely one month later. Those nine points alone would have put Asante at the top end of CHC IV.

The remainder of Asante's criminal history score generally follows the same pattern of his acceptance of relatively high sentences for comparatively minor offenses, often for practical reasons. At age 19, Asante shoplifted a $34.88 cellphone charger from Walmart. He pleaded guilty to larceny in the sixth degree. Although a jail sentence is almost never imposed for such a charge, he received sixty days concurrent to a previously imposed sentence, resulting in two criminal history points. (PSR ¶ 104). Asante's agreement to such a high sentence made sense at the time because it did not extend his period of incarceration, but he did not consider the impact it could have on his criminal history score.

Asante's only other criminal history points arise from a misdemeanor assault in the third degree conviction where he received the lowest possible sentence of an unconditional discharge; failure to appear; and larceny in the second degree. (PSR ¶¶ 102, 103, 106). The misdemeanor assault conviction, moreover, for which he received the unconditional discharge, is also his only conviction that involved the use of physical force.

The manner in which criminal history is scored under the guidelines means that someone with a more serious criminal history may actually have a lower criminal history score. Codefendant L.J. is a good example. He was convicted of two counts of attempt to commit assault in the first degree pursuant to General Statutes § 53a-59(a)(1), which required the state to prove that "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." He was sentenced to two concurrent eight year sentences. CR 12-0268412. He also had a conviction for robbery in the second degree, for which he received a sentence of ten years, execution

suspended after five years, followed by five years of probation. CR 13-0269865. L.J. also received a sentence of ten years, execution suspended after five years, followed by five years of probation for sale of narcotics. CR 12-0269431. L.J. therefore had four felony convictions – three for crimes of violence and one for selling narcotics – and received sentences of between five and eight years for each conviction.[6] Yet he is in CHC III, (see Doc. 493 at 4), whereas Asante, whose only conviction involving physical force is a misdemeanor third degree assault, and who never received a sentence as high as four of L.J.'s sentences, is three categories higher. L.J., moreover, received the same three criminal history points for twice attempting to cause serious physical injury with a deadly weapon or dangerous instrument as Asante did for failing to mail a form with his address and other identifying information to a state agency. See General Statutes § 54-280a; PSR ¶ 111. Accordingly, Asante's criminal history score substantially overrepresents the seriousness of his criminal history.

      ***Second***, this Court is undoubtedly familiar with the sentencing mitigation arguments based on a defendant's youth when he committed the charged offense. These arguments derive from a number of neuroscientific studies. The United States Sentencing Commission's examination of this issue caused it to remark:

> the prefrontal cortex of the brain, which is located at the front of frontal lobe and is the last part of the brain to fully develop. The prefrontal cortex is utilized in impulse control, emotional reactions, executive function and decision making. . . . maturation is completed in the mid-20s. . . . More recent studies also account for the confounding effect of marijuana and alcohol use on the adolescent brain and its development, with results indicating further delays in brain development among youth and young adults with substance abuse histories. . . . [T]here are a number of points on which researchers in this area generally agree. First, researchers agree that the prefrontal cortex is not complete by age eighteen, which

---

[6] The government discussed L.J.'s criminal history in its sentencing memorandum. (Doc. 493 at 40). Information on the Connecticut judicial branch website confirms the government's description. See https://www.jud2.ct.gov/crdockets/SearchByDefDisp.aspx. (Last checked May 24, 2022).

is the legal age of majority in most states and in the federal system. Second, researchers agree that development continues into a person's twenties. Third, most researchers reference twenty-five as the average age at which full development has taken place, but also note significant variations from person to person.

See, Youthful Offenders in the Federal System, United States Sentencing Commission, May 2017, pages 6-7. See also <u>Graham v. Florida</u>, 560 U.S. 48, 76 (2010) ("criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.")

The emerging understanding about the correlation between youth and criminal behavior resulted in a notable amendment to U.S.S.G. § 5H1.1. This section now states, "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1. This is a significant change from the prior language that explicitly stated that "[a]ge, (including youth) is not ordinarily relevant in determining whether a departure is warranted."

Such arguments admittedly have limited applicability in relation to the courthouse shooting because Asante was twenty-three year old at that time. And as this Court correctly noted when it sentenced codefendant M.I., "[e]ven if perhaps their frontal cortex is not 100 percent and completely developed, it is certainly enough to know the absolute wrongfulness of trying to kill." (M.I. sentencing transcript at 53, Mar. 4, 2022). But the age-based mitigation arguments logically apply to an evaluation of Asante's criminal history score because that score is based entirely on conduct that occurred when he was a teenager or barely into his twenties. Just as age can affect an assessment of the seriousness of a particular crime, the mitigating

effects of youth should be considered when evaluating the seriousness of a person's criminal history score.

> **Third**, the doctrine of incremental punishment warrants a well-below guidelines sentence.

See United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001). The Court in Mishoe stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

Mishoe principally addressed the career offender guidelines, but its lesson applies here. See also United States v. Qualls, 373 F.Supp.2d 873, 877 (E.D. Wis. 2005) ("[g]enerally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.") As United States Probation Officer Megan D. Nagy noted in the presentence report, Asante's longest period of incarceration has been sixteen months, and the Court may therefore "consider incremental punishment and determine that the advisory guideline term of 30 years' custody is greater than necessary to achieve the goals of sentencing." (PSR ¶ 184).

### C.     The Need to Avoid Unwarranted Sentencing Disparities

One of the recognized purposes of sentencing is to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Giving effect to this purpose supports a sentence well below Asante's guidelines range. Certain codefendants have apparently benefitted from their lower criminal history scores, but that can be misleading, or as the government argued in relation to codefendant U.K., who was in CHC I, "an empty and impractical appraisal" given "the sheer magnitude of [his] violence and mayhem. . . ." (Doc. 513 at 28-29). U.K. admitted in his plea

agreement that he attempted to kill three people, one of them twice, in three separate shootings. (See Doc. 266 at 6). The second incident, at the Sunshine Deli on February 27, 2018, involved a total of three people shooting into a crowded convenience store. Because no one was convicted, however, none of three assailants received criminal history points. Although the identities of U.K.'s conspirators are not known, Asante definitely was not one of them; he was incarcerated on February 27, 2018 while serving a sentence for larceny. (See PSR ¶ 106). Another codefendant in CHC I, J.B., admitted to committing two attempted murders where the victims sustained serious bodily injury. (Doc. 270 at 4). A third codefendant, D.B., admitted to participating in two shootings, at the courthouse and a prior one. (Doc. 314-1 at 4-5). D.B. was in CHC II. (Doc. 314-1 at 5).

One could easily argue that U.K.'s three shootings and the two shootings committed by J.B. and D.B. that resulted in no criminal history points nevertheless constitute a more serious criminal history than Asante's convictions that consist of almost entirely of nonviolent offenses. Several of his convictions, moreover, are regulatory in nature, i.e., two convictions for failure to appear and the firearm registry conviction that resulted in a total of eight criminal history points. (PSR ¶¶ 102, 110, 111). Despite the admissions to multiple shootings by U.K., J.B. and D.B., each received a considerably lower sentence than Asante's guidelines range – J.B. was sentenced to 97 months, (Doc. 432), D.B. was sentenced to 180 months, (Doc. 486), and U.K. was sentenced to 210 months. (Doc. 520). The need to avoid unwarranted disparities with these codefendants for Asante's participation in one shooting incident supports a sentence of 150 months.

A comparison to L.J. is also appropriate because his offense level and criminal history score are closest to Asante's, and their guidelines ranges of 360 months are the same. For the

reasons already discussed, as well as those discussed below, the equities favor a lower sentence for Asante than the 190 months that L.J. received.

L.J.'s offense level was 41.[7] (Doc. 372 at 5). L.J. and the government believed that he was in CHC V, but the United States Probation Office determined that he was in CHC III. (See Doc. 493 at 4). The lower criminal history score did not affect L.J.'s guidelines range, however, because he did not receive a two point reduction for acceptance of responsibility, and the range for offense level 41 and CHC III is the same as for CHC V.

If the Court grants a two level reduction to Asante, who pleaded guilty before jury selection, his offense level will be 39 and his criminal history category is VI. L.J. and Asante each admitted to being involved in the courthouse shooting. As he neared his sentencing hearing, however, L.J. seemingly minimized his role in the courthouse shooting when he claimed that he "did not know of or plan to shoot anyone." (Doc. 492 at 11). The government responded by arguing that he "has not yet fully accepted responsibility." (Doc. 493 at 2). "Most troubling however was [L.J.'s] role in the courthouse shooting and his current minimization of that role," to the point that "[he] has not fully accepted responsibility for what he did." (Doc. 493 at 38, 43). Asante has accepted responsibility for his role in the courthouse shooting, which stands in stark contrast to L.J. Asante recognizes how serious and unacceptable it was, and he is very remorseful.

Asante is more favorably positioned from a sentencing perspective than L.J. for another reason. The government described L.J. as "unique" from his codefendants because he was a

---

[7] L.J.'s plea agreement contemplated that the offense level might be 39 if the Court granted him a two level reduction for acceptance of responsibility despite his guilty plea after jury selection had begun. (Doc. 372 at 5). Upon information and belief based on discussions with the government after L.J. was sentenced, he did not receive a two level reduction, although the reason was due to the minimization of his role in the courthouse shooting.

founding member of GHB and involved since 2012. (Doc. 493 at 39). Asante was not. Asante is also more favorably positioned as to all of his codefendants except L.J. in another respect. His involvement was necessarily more limited because he was in custody for more than 30 months during the relevant time period.[8] Asante was incarcerated for a shorter period than L.J., who served approximately seven years. This served to separate both from the group; although L.J. had a lengthier separation, which mitigates his role in relation to Asante, L.J.'s lengthier separation was due to his more serious criminal history as reflected by his longer periods of incarceration for more serious violent crimes. Asante was separated from the group for two-and-a-half years for much less serious offenses.

A third distinguishing fact is that L.J. is two years older than Asante. Unlike the previously sentenced codefendants "who argued that their brains were not fully formed at the time of their criminal conduct, [L.J.] has no such excuse," according to the government. (Id., 41). L.J. was twenty-five years old and "older than many of his peers," including Asante, when the courthouse shooting occurred. (Id., 42).

D.C. is also two years older than Asante, but he received a 97 month sentence that was well below his guidelines range of 135 to 168 months. While a variety of factors necessarily contributed to his sentence, D.C.'s greater age and the fact that he drove one of the cars to and from the courthouse should be considered when evaluating Asante's relative culpability.

---

[8] See footnote 3.

**IV.** <u>**Asante would benefit from RDAP**</u>

Asante respectfully asks the Court to recommend his placement in the 500 hour Residential Drug Abuse Program pursuant to 18 U.S.C. § 3621. He recognizes that he has a substance abuse problem and is interested in treatment. (PSR ¶¶ 137-140). If he is able to successfully overcome his chemical dependence, it should go a long way to ensuring that he leads a law-abiding life.

**V.** <u>**Conclusion**</u>

For the foregoing reasons, including his background, character, future potential and strong support network; his role in the offense; the overrepresentation of his criminal history; and the need to avoid unwarranted sentencing disparities, Asante Gaines respectfully asks the Court to impose a sentence of 150 months.

<div style="margin-left:auto; width:50%;">

THE DEFENDANT
ASANTE GAINES


By: <u>*s/ Jeffrey C. Kestenband*</u>
Jeffrey C. Kestenband, ct19003
The Kestenband Law Firm LLC
2389 Main Street
Glastonbury, CT 06033
Tel. No.: (860) 659-6540
Fax No.: (860) 397-6550
jkestenband@kestenbandlaw.com

</div>

<u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing was filed electronically, on this 26th day of May, 2022, and sent by first-class mail, postage prepaid, to anyone unable to accept electronic filing. Notice of the filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

<u>*s/ Jeffrey C. Kestenband*</u>